UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
N.U., Infant, by his Mother and Natural Guardian,
NUBAISHA AMAR, and NUBAISHA AMAR,
individually,

                           Plaintiffs,

           -against-

EAST ISLIP UNION FREE SCHOOL DISTRICT,
a/k/a EAST ISLIP SCHOOL DISTRICT, EAST ISLIP
MIDDLE SCHOOL, JOHN V. DOLAN, MARK
BERNARD, and JASON STANTON,

                       Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**
16-cv-4540 (SJF) (ARL)

**FILED
CLERK**

2:45 pm, Nov 30, 2020

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

FEUERSTEIN, District Judge:

       Plaintiffs N.U. ("N.U." or "infant-plaintiff") by his mother, Nubaisha Amar ("Amar"),

who also appears individually (collectively, "Plaintiffs"), commenced this action against

Defendants alleging, *inter alia,* violations of their rights under Fourth and Fourteenth

Amendments to the United States Constitution.   Currently before the Court is a motion for

summary judgment by the remaining defendants, [1] Mark Bernard ("Bernard") and Jason Stanton

("Stanton") (collectively "Defendants") pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  *See* Motion, Docket Entry ("DE") [65].   Plaintiffs have opposed the motions.   For

the reasons set forth herein, the motion is granted.

---

[1] Defendants East Islip Union Free School District and East Islip Middle School (collectively, the "District") and John V. Dolan were previously dismissed from this action.

## I. BACKGROUND

### A. Factual History[2]

At the time of the incidents underlying this litigation, N.U. was a twelve year-old boy attending the seventh grade at East Islip Middle School, and Bernard and Stanton were the Principal and an Assistant Principal, respectively, at the school.

i.    Cafeteria Incident and Preliminary Investigation

On January 6, 2016, N.U. told other students in the school cafeteria that he was a terrorist and was going to blow up the school fence.  Plaintiffs do not contest that he made the statement, but argue that whether N.U. "knew the meaning of the word 'terrorist' is matter of significant dispute" given his learning disabilities including, *inter alia,* language, vocabulary and communication impairment.  Pls. 56.1 Cntr-Stmt ¶22.  They further claim that prior to making this statement, N.U. had been subjected to severe bullying by a group of older students who "continuously called him a 'terrorist' and repeatedly asked him what he would blow up next." *Id*.

Two students testified to hearing N.U. make statements in the cafeteria regarding bombs at the school.  *See, e.g.,* Silverman Decl., Ex O, Deposition of A.A. ("A.A. Dep.") at 14 (N.U. said "don't come to school tomorrow" and that he was going to blow up the school after school); *id.*, Ex N, Deposition of C.A. ("C.A. Dep.") at 24 (N.U. "was saying how he's part of ISIS and

---

[2]The facts, which are undisputed unless otherwise noted, are drawn from Defendants' Local 56.1 Statement of Material Facts ("Defs. 56.1 Stmt."), DE [67] ;  Declaration of  Lewis R. Silverman ("Silverman Decl."), DE [66] and exhibits thereto; Plaintiffs'  Local Rule 56.1 Counter-Statement, DE [71]; ( "Pls. 56.1 Cntr-Stmt."); and Declaration of David A. Antwork in Opposition ("Antwork Decl."), DE [70], and exhibits thereto.  Only those facts that are material to the disposition of the motion are set forth herein.  *See Zann Kwan v. Andalex Grp.,* 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

making jokes about having bombs and stuff.  And we were telling him that's not funny that's not

something you should joke about, that's something you can get in trouble about.  And I

remember him saying he's not joking").  C.A. testified that he heard N.U. using the word

"terrorist," *see* C.A. Dep. at 11 (N.U. was "saying stuff about him being a terrorist and stuff

about bombs"), while A.A did not.  A.A. Dep. at 18.

As to the bullying N.U. claims to have experienced prior to making the statements, he

testified that two unidentified eighth grade boys peppered him with questions including "'What

do you have going on in your mind.  You're a terrorist, what's on your mind, what is going on,

what are you going to blow up next.'"  Silverman Decl., Ex. D, 6/7/16 50-h Deposition of N.U.

("N.U. 50-h") at 21, 24.  He "got annoyed," and said "Yes, I'm a terrorist, I'm going to go to

school, I'm here to go to school and I'm going to blow up the school fence." *Id.* at 25.   N.U.

returned to his seat, did not tell his friends about the exchange, and said that his friends did not

hear it.  *Id.* at 25-26. During a subsequent deposition, N.U. testified that three, not two, students

came up to him while he was sitting  by himself and told him he was a terrorist, but they had

never done that before.   Silverman Decl., Ex. E, 4/25/18 Deposition of N.U. ("N.U. Dep.") at

16-17.  C.A. never witnessed students bullying or teasing N.U. or calling him a terrorist. C.A.

Dep. at 15, 25.  A.A. did not witness any bullying, harassing, or teasing of N.U. in the cafeteria

that day, A.A. Dep. at 18, nor did N.U. ever confide in him about other students bullying him.

*Id.* at 25.  A.A. did  hear someone in the cafeteria call N.U. a terrorist, just once, on the day of

the incident, *see id.* at 19, but the comment was made after N.U. had "started saying about all

this stuff that he was going to do." *Id.* at 19-20.

The parties agree that the original incident took place on January 6, 2016, and there does

not appear to be a real dispute that the investigation conducted by Bernard and Stanton took

place on the following day, January 7, 2016.  The evidence is unclear, however, as to when Bernard and Stanton were made aware of the incident. On the day of the incident, C.A. stated that he and another student, L.F., went to a lunch room aide, not a teacher, where L.F. "said the whole stuff." C.A. Dep. at 14.   A.A. did not report it to anyone.  Bernard was apprised of the incident by a teacher, Judith Fischer, and Bernard advised Stanton.  Fischer told Bernard that students had reported to her that another student made a threat to blow up the school, and that the students indicated that they were nervous and anxious.  Silverman Decl., Ex. H, Deposition of Mark Bernard ("Bernard Dep.") at 17.  Fischer's written statement says that the events took place on January 7, 2016;[3] Bernard testified that he learned about incident on the afternoon of January 7, 2016, and that all the interviews took place on January 7th, Bernard Dep. at 17; A.A. thought he was interviewed the day of the incident, but could not be completely sure; and Stanton started his testimony saying the interviews were conducted on January 6th and later became uncertain and thought it was the next day.  There is no dispute that N.U. was interviewed on January 7, 2016.  Plaintiffs suggest that the date is in "significant dispute" because "[i]f Defendants learned of the alleged 'threat' on January 6, 2016 and waited until the following day to question N.U., that would certainly undermine any perceived danger of legitimate 'threat.'" Pls. 56.1 Cntr-Stmt. ¶23.

---

[3] In her statement, Mrs. Fischer says that on January 7th,  two boys "told me a student who was sitting with them said he was a terrorist and was going to blow something up."  While this clearly evidences when *she* was told about the statements, there is nothing to indicate that the boys stated when those statements had been made *to them*.  As such, her statement  is not necessarily inconsistent with the underlying incident having taken place the previous day.  It is unknown whether Ms. Fischer was deposed and no further illumination can be found on the record

Defendants Bernard and Stanton conducted five (5)  student interviews[4] pertaining to the cafeteria incident, including and culminating with their interview with N.U.  Two of the students interviewed, L.F. and C.A., had expressed concerns to Fischer.  L.F. was interviewed first, but it was determined that he did not have firsthand information.

C.A. was interviewed next.  At the conclusion of the interview, C.A. prepared the following written statement:

> He was saying he's a terrorist and when I asked if it was true he said yes. He then said he was going to blow up the school.  So I told him that's not something to joke about and he said he wasn't joking.  He proce[ed]ed to say that he already has the bombs and he was deciding when to set them off and it would probably [be] at night.  He then yelled something in a language I couldn't understand and then he said he's going to be part of Isis.  After when I asked what did he yell, he said it was in Muslim.  I then tried to stay away from him and I ignored him.

Silvernan Decl. Ex. K, C.A. Written Statement.  C.A. testified at his deposition that the written statements was accurate, that the statement was in his own words and handwriting, signed by him, and that no one forced or threatened him or told him what to write.  *See* C.A. Dep. at 26-28.

Another student, M.A., was then interviewed.[5]  M.A. expressed surprise and shock, and denied making any comments about being a terrorist or blowing up the school.  Bernard Dep. at 21-22.   M.A. indicated to Bernard that he may have overheard talk on the subjects in the hallway or other areas of the school.  *Id.* at 23-24.  M.A.'s belongings were not searched.  He offered that A.A. might have information.

---

[4] A sixth student, L.A., came forward a few days later, after N.U. had been suspended, and also gave a statement.   Silverman Decl. Ex. M, L.A. Written Statement. There is no suggestion that Bernard and Stanton were aware of this witness or the content of her statement prior to taking action on January 7th.
[5] It is unclear how M.A. was identified to the school officials.  He was not one of the students who reported to Fischer.  Stanton and Bernard testified that C.A. provided M.A.'s name, *see* Stanton Dep. at 65, but C.A. said he did not.  C.A. Dep. at 21.

A.A. was brought in, indicated that N.U. had made the statements in the cafeteria the previous day and that he, A.A., had heard them.  Bernard Dep. at 25.  A.A. prepared the following statement after his interview:

> I walked into lunch in period 7.  I was sitting on the table and [N] comes by sits down gets his lunch and eats, after a while he starts talking about how he was going to blow up the school and when he was gonna blow it up.  He says tomorrow Thursday afternoon when everyone leaves the school "I am going to come and explode this school until everyone in this school dies and I don't care if I get into trouble."  After telling him not to say that he said "I don't care I can say what I want."  After a while 10 minutes later he keeps reapeting [sic] it. Me and [C] start getting scared about it.

Silvernan Decl. Ex. L, A.A. Written Statement.  A.A. also testified at his deposition that his written statement was accurate, in his own words and handwriting, signed by him, and that no one forced or threatened him or told him what to write.  *See* A.A. Dep. at 34-36.

ii.   N.U.'s Contacts with Defendants

After completing the interview of A.A., Stanton removed N.U. from his class at the end of the last period of the school day and brought him to the building's administrative offices. There is some discrepancy regarding the sequence of events after N.U. arrived at the office; it is undisputed, however, that there were periods of time during which (1) both Bernard and Stanton questioned N.U. in Stanton's office; (2) Stanton and N.U. went into an adjacent conference where, with the door open, (a) a search of N.U.'s belongings was conducted, and (b) N.U. prepared at least one written statement; and (3) N.U. was told by Stanton to do his homework in the conference room.   Testimony from Bernard and Stanton, and from N.U. in June 2016, correspond to this sequence of events.  In his subsequent deposition, however, N.U. indicated that his prior testimony as to the sequence was inaccurate and that Stanton conducted the search and secured N.U.'s written statement *before* the questioning by Bernard and Stanton.

### a.  Questioning of N.U.

Once in Stanton's office, Stanton sat at the desk, N.U. in a chair, and Bernard in the other chair, and the door was open.  N.U. was asked specific questions including whether he had said he was going to blow up the school, that he said he was a terrorist, or that he said he was part of ISIS, and whether he had bombs at his house.  Bernard Dep. at 30.   In response to the question of whether he said he was a terrorist, N.U. responded, "I'm a tourist."  Silverman Decl., Ex. I, Deposition of Jason Stanton ("Stanton Dep.") at 109.  Bernard or Stanton provided definitions of the words, 'terrorist' and 'tourist.'   N.U. admitted that he had said he was a terrorist and was going to blow up the school fence.  N.U. Dep.  at 32, 33;  N.U. 50-h at 19.    They also asked if he had said something in a different language in the cafeteria, and N.U. confirmed that he had said "Aslamoalakam," which he defined as a greeting, "Hi," in Urdu."[6]   The parties do not dispute that Bernard maintained a calm demeanor in dealing with N.U., but dispute that Stanton was similarly calm.  *See, e.g.,*  N.U. 50-h at 34. (Stanton yelled "Don't lie to us because we know that you said this.");  *id.* at  35. ("whenever [Stanton] speaks he's just yelling at me").  Stanton did not physically touch N.U.

There is no evidence that N.U. reported the bullying incident that purportedly preceded the making of the statement in the cafeteria to any school official prior to or during his interview with Bernard and Stanton.

### b.  Search of N.U.'s belongings

Stanton searched N.U.'s locker.  Stanton also took N.U. to a conference room where he conducted a search of N.U.'s. belongings.  N.U. testified that that Stanton said "I want to check your bag" and that he said "okay."  N.U. 50-h at 39-40.   Plaintiffs argue that any consent given

---

[6] The phrase contained in N.U.'s statement is alternatively spelled in places in the record as "As-Salaam-Alaikum."   The Court will employ the spelling used by N.U. in his written statement.

7

was "due to his disabilities, Defendant Stanton's anger and demeanor which frightened N.U. and the fact that defendants did not notify N.U.'s parents prior to the search."  Pl. 56.1 Cntr-Stmt ¶56.  Stanton testified that they were looking for "[a]ny explosive devices."  Stanton Dep. 140.

Although N.U.'s wallet and phone were in his backpack, Defendants claim that neither item was searched by Stanton, while Plaintiffs contend that he searched both.  N.U. gave conflicting testimony regarding the search of his phone.  He first testified that Stanton asked for the phone, that N.U. gave it to him, and that the phone "was unlocked, no password."  N.U. 50-h at 43.  He subsequently testified that the phone was locked, that Stanton told him to unlock it, and that N.U. entered the password himself.  N.U. Dep. at 24.  Defendants argue that under either scenario, N.U. consented to any search.

As to the wallet, N.U. testified that Stanton "went through" his wallet.  N.U. 50-h at 42. Beyond this statement, there is no testimony regarding the scope of any search of the wallet such as whether Stanton purportedly removed items and examined them individually or just leafed through it.  However, N.U. testified that the entire investigation of his bag took a minute and a half.  *Id.* at 44.  The search did not turn up any explosives.

### c.  *N.U.'s Written Statement*

It is undisputed that N.U. provided a written statement that provides as follows:

> I was in school caf[e]teria and said "I am a terrorist, I am here to go to
> school and blow up the fence at the field, Aslamoalakam – Hi.

Silverman Decl. Ex. K, N.U. Written Statement.  The parties dispute how that statement came to be prepared and whether this was the first or second statement written by N.U.

Stanton testified that he asked N.U. to write down what he had told Stanton and Bernard in the office.  N.U. returned the statement to Stanton, and Stanton gave it back for signature. After N.U. signed it, Stanton reviewed it again and asked him to add what he meant by

"Aslamoalakam," at which time N.U. included the dash and wrote "Hi."  He asked N.U. if everything was correct and N.U. responded yes.  Stanton said this was the only correction he pointed out, that only one statement was written by N.U., and that he, Stanton, did not rip or discard any version of the statement written by N.U.

N.U. testified that Stanton told him what to write in the statement: "he told me to write I'm a part of ISIS, I had bombs in my house, I was going to blow up the school."  N.U. 50-h at 45.  Instead, N.U. wrote "I'm a terrorist, I'm here to go to school and blow up the fence at the field."  *Id.* at 46.  Stanton tore up this first statement and gave N.U. a new piece of paper.  *Id.* at 46, 47; N.U. Dep. at  37.   Stanton again told him to write "the same stuff" about ISIS, and bomb making knowledge, and to write that he was going to blow up the whole school.   N.U. 50-h at 48; N.U. Dep. at 35-36.  N.U. said "okay," but instead wrote the second statement.  The second statement was the same as the first except he added "I was in the school cafeteria and said." N.U. 50-h at 27.  Plaintiffs do not dispute that N.U. did not write down anything that Stanton told him to write, but contend "[t]hat Plaintiff N.U. even came to write the statement was brought about through the direction and insistence of Defendant Stanton."  Pls. 56.1 Cntr-Stmt. ¶59.

### d.  N.U.'s suspension

At the direction of the District Office, Bernard called 911 and told the dispatcher that he wanted to fill out a police report.  After the call, the fire alarm was activated and the Middle School  was evacuated.  Plaintiff Amar, N.U.'s mother, met with Bernard and with the police officer.  Plaintiffs consented to a police search of N.U.'s phone.

Bernard advised Amar that N.U. would be suspended for five (5) days, pending a Superintendent's Hearing.  Bernard instructed Stanton to prepare a suspension letter, and Stanton

had his secretary do so.  The suspension letter was dated January 7, 2016, confirmed the

suspension, effective Friday, January 8, 2016, and advised that the suspension was the result of

N.U. "making a terroristic threat" in violation of the district code of conduct.  Silverman Decl.,

Ex. Q.  The Superintendent's Hearing was originally scheduled for January 14, 2016, but was

adjourned three (3) times at Plaintiffs' request.   Amar consented to a psychiatric evaluation of

N.U., which was conducted on January 26, 2016, a meeting was held between N.U.'s parents and

a member of the Superintendent's staff on February 4, 2016, and N.U. returned to school on

February 9, 2016.  During the period of time N.U. was out of school, he received home

instruction tutoring.

### e.  N.U.'s learning disabilities

N.U. was enrolled in the District's Special Education Department from kindergarten

onwards.[7]  The 2013 Speech and Language Evaluation reviewed the results of various tests and

concluded that N.U. "exhibits average to low range skill development as measured by the

Clinical Evaluation of Language Fundamentals."   The 2015-16 IEP indicates, *inter alia,* that as

to reading, N.U. "has difficulty identifying the meaning of unknown vocabulary words in a

reading passage."   As to his social development, it indicates that his "social and emotional levels

and abilities are within age expectations," that he is a "kind boy" who gets along with his peers

and has "respect for his teachers," and that there are "no social and emotional needs that should

be addressed through special education at this time."   2015-16 IEP at 3.   His "significant delay

in reading comprehension, written expression and study skills" interfere with his "participation

in age appropriate activities."  *Id.* at 4.   The 2015-16 IEP calls for 40 minute, daily integrated

---

[7] Plaintiffs have provided various reports from the Special Education Department, including the
Individualized Education Program for the 2015-16 school year ("2015-16 IEP") .  The most recent Speech
and Language Evaluation provided is dated December 2, 2013 ("2013 Evaluation").   *See* Antwork Decl.,
Ex. 1.

co-teaching sessions, and provides for testing accommodations of additional time and flexible settings, but notes that he will participate "in the same State and district-wide assessments of student achievement that are administered to general education students." *Id.* at 7.

Stanton had met with N.U. during his sixth grade year regarding latenesses from school. This was the only prior interaction between Stanton and N.U.  Stanton attended a manifestation meeting at the beginning of the school year that he described as "informational" and a "review of anyone that has any sort of disability."  Stanton Dep. at 24.  He was not aware of the details of N.U.'s disabilities or his IEPs prior to the January 6, 2016 incident.  *Id.* at 32.

Bernard recalls no interactions with N.U. prior to the incident on January 6, 2016: N.U. recalled only saying hello and goodbye in passing.  Bernard knew that N.U. had an IEP that entitled him to testing accommodations, but was not aware of the reasons for N.U.'s classification as learning disabled.   Bernard Dep. at 14-15.

## B.  Procedural History

The complaint asserted twelve causes of action against the District, Dolan, Bernard, and Stanton.  On September 15, 2017, Defendants' motion to dismiss was granted in part and denied in part.  Opinion & Order of 9/15/17, DE [34]; *N.U. vs. Amar v. E. Islip Union Free Sch. Dist.,* 2017 WL 10456860 (E.D.N.Y. Sept. 15, 2017).   All Defendants were dismissed except Bernard and Stanton.  The remaining claims are: (1) a §1983 claim asserting violations of the Fourth Amendment against Stanton pertaining to the search of the wallet and phone; (2) a §1983 claim asserting substantive due process violations of the Fourteenth Amendment against Bernard and Stanton; and (3) a state law claim for intentional infliction of emotional distress ("IIED") against Bernard and Stanton.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting FED. R. CIV. P. 56(a)).   In deciding a motion for summary judgment, "the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.").

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks omitted); *see also Anderson,* 477 U.S. at 248 (a motion for summary judgment should be denied if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party").  All facts under consideration must be directly

supported by admissible evidence.  *See* FED. R. CIV. P. 56(c).

The party opposing summary judgment must, however, "do more than simply show that

there is some metaphysical doubt as to the material facts" but rather "must come forward with

specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)

(internal quotation marks omitted); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,

315 F.3d 171, 175 (2d Cir. 2003) (noting that "[c]onclusory allegations, conjecture, and

speculation ... are insufficient to create a genuine issue of fact.").  "The mere existence of a

scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of*

*N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252) (alterations in

original).

**B.  Section 1983**

Section 1983 does not itself create any substantive rights, but rather "provides only a

procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v.*

*Roach,* 165 F.3d 137, 142 (2d Cir. 1999).  To prove a §1983 action, a plaintiff must establish two

essential elements:  (1) that the defendant acted under color of state law, and (2) that as a result

of the defendant's actions, the plaintiff was deprived of "any rights, privileges, or immunities

secured by the Constitution and its laws." *Hawkins v. Nassau Cnty. Corr. Facility,* 781 F. Supp.

2d 107, 111 (E.D.N.Y. 2011).  The parties here do not dispute that Bernhard and Stanton were

acting under color of state law.  Accordingly, the Court need only address whether Defendants

violated Plaintiffs' constitutional rights.

13

**C.  Qualified Immunity**

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  It is an affirmative defense and the defendants have the burden of proof.  *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).

Analysis of a qualified immunity defense raised in opposition to a motion for summary judgment rests upon consideration of two questions:  (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation.  A district court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (internal quotation marks and citation omitted). If officials of "reasonable competence could disagree on the legality of the action at issue in its particular factual context, then the defendant is entitled to qualified immunity, even if the right at issue was clearly established in certain respects." *Doninger v. Niehoff,* 642 F.3d 334, 353 (2d Cir. 2011).   Where the law was clearly established, "the availability of qualified immunity 'generally turns on the [defendant's conduct's] objective legal reasonableness.'"  *Johnson v. Perry,* 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107

S. Ct. 3034, 97 L. Ed. 2d 523 (1987)(alteration in original; internal quotations and citation omitted)).

"[T]he Supreme Court has repeatedly (and recently) reminded us that clearly established law must be particularized to the facts of the case and must not be defined at a high level of generality." *Naumovski v. Norris,* 934 F.3d 200, 211  (2d Cir. 2019) (internal quotation marks omitted).  Immunity is only forfeited when "existing precedent . . . [has] placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011), and that precedent has been applied "under similar circumstances." *White v. Pauly,* -- U.S. --, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017); *see also Creighton,* 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").   "Qualified immunity thus protects 'all but the plainly incompetent' and those who 'knowingly violate the law.'"  *Naumovski,* 934 F.3d at 211 (quoting *White,* 137 S. Ct. at 551).

## III.  DISCUSSION

### A.  Section 1983 – Fourth Amendment Search and Seizure

It is well established that students do not "shed their constitutional rights . . . at the schoolhouse gate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S. Ct. 733, 21 L.Ed.731 (1969).  While public school students are entitled to Fourth Amendment protections, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject."  *New Jersey v. T.L.O.,* 469 U.S. 325, 340, 105 S. Ct. 733, 83 L.Ed. 2d 720 (1985).  The Supreme Court instructs that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search" and is determined using a twofold inquiry.  *Id.* at 341.  A court considers whether the search was

15

justified at its inception, and if so, "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L. Ed. 2d 889 (1968)). Searches and seizures are reasonable in scope where "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.,* 469 U.S. at 341-42. The same standard has been employed in determining whether a seizure by school officials was lawful. *See, e.g., Bisignano v. Harrison Cent. Sch. Dist.,* 113 F. Supp. 2d 591, 596 (S.D.N.Y. 2000). The court in assessing the professional judgment of school officials grants such officials "a high degree of deference." *Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364, 377, 129 S. Ct. 2633, 174 L. Ed. 2d 354 (2009).

This Court has previously determined that, given a school official's interest in protecting student safety, "and because N.U. threatened to commit a serious act of violence at the Middle School, Defendants were justified both in questioning N.U. about his threats and in searching N.U.'s belongings that may contain evidence that N.U. had violated or was violating either the law or school rules." *N.U. by Amar,* 2017 WL 10456860, at *11. It was further noted that Plaintiffs had failed to allege that N.U. conveyed his confusion regarding the meaning of the word "terrorist" to Defendants. *Id.* Plaintiffs contend that the question of whether the search and seizure was justified at the inception was thus left "open" since the earlier decision was "premised upon N.U.'s misunderstanding having not been communicated to Defendants when it in fact was as confirmed by Defendants Bernard and Stanton." Pls. 56.1 Cntr-Stmt, ¶14. Their argument fails on several fronts. They overstate the significance of the cited language in the Opinion, which language was dicta and not the basis for the holding. More importantly, while

16

Plaintiffs persist on focusing upon N.U.'s confusion regarding the word "terrorist," they ignore his use of the language "blow up the fence," a phrase that they do not suggest was uttered by N.U. in confusion as to its meaning.  N.U.'s admitted use of this language alone provided ample justification for confining him for questioning and conducting a search of his belongings.  *See N.U. by Amar,* 2017 WL 10456860, at \*11.  Thus, the Court adheres to the determination that the seizure and search were justified at the inception,[8] and turns to an analysis of the reasonableness of Stanton's actions.

Plaintiffs have tied the issue of whether the confinement of N.U. for the purpose of obtaining his written statement was reasonable to the question of how Stanton obtained the statement, which they deem a "coerced confession." These two issues, however, present separate claims under the Fourth Amendment.[9]  While the reasonableness of the confinement implicates the Fourth Amendment's right against unreasonable seizures, the tactics used by Stanton in procuring the written statement present a claim of whether that conduct violated N.U.'s right to substantive due process.  *See generally Mara v. Rilling,* 921 F.3d 48, 78 (2d Cir. 2019) (plaintiff claimed that "whether or not his statements were used against him, defendants' tactics in procuring them violated his right to substantive due process").  The substantive due process claim will be addressed *infra.  See* Section III.B.

---

[8] In opposition to this motion, Plaintiffs repeatedly focus on N.U.'s learning disability, arguing that "N.U.'s disability specifically as it pertained to his vocabulary and communication impairments should have, at a minimum, given the Defendants some pause and perhaps altered their treatment of N.U."  Pl. Opp. at 8.  That portion of Defendants' motion to dismiss for lack of subject matter jurisdiction for Plaintiffs' failure to exhaust their claims prior to filing a lawsuit in federal court as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.,* was denied upon the finding that, *inter alia,* the claims arose from "the alleged bullying, harassment, and mistreatment of N.U., and not out of whether N.U.'s educational plan was appropriate or properly implemented."  *N.U. by Amar,* 2017 WL 10456860, at \*5.  To the extent that Plaintiffs are now suggesting that N.U.'s conduct was attributable to his disability, they did not seek a manifestation hearing at the school or otherwise seek relief at the District and thus any attempt to assert such a claim fails for failure to exhaust.

[9] Plaintiffs do not claim that Stanton's procurement of a coerced statement violated the self-incrimination clause of the  Fifth Amendment.

As to the seizure of N.U.,  it was reasonable in both duration and scope.  After Stanton completed the search of N.U.'s belongings, N.U. returned his things to the bag and was told to stay in the conference room and do his homework, which he did for 20 or 25 minutes.  N.U. Dep. at 25, 31.  There is no suggestion that the time spent preparing the written statement, or statements, was unduly long.  The door to the room was open at all times and there is no allegation that N.U. was physically touched or restrained in any way.  On the other hand, school officials were dealing with a bomb threat admitted by the person who made the threat and confirmed by other students.  In an abundance of caution, they must treat all such threats with deadly seriousness and conduct thorough investigations, regardless of how legitimate they feel the threat may be.  As the seizure was reasonable and no rational jury could find otherwise, summary judgment in Defendants' favor is granted.

Regarding the search of N.U.'s phone and wallet, Defendants deny that Stanton searched those items, but contend that even if he had, the conduct would have passed constitutional muster.  A search is permissible in its scope where it is reasonably related to the search's objectives and "not excessively intrusive in light of the age and sex of the student and the nature of the infraction."  *T.L.O.* 469 U.S. at 342.  A cellular phone can be used to detonate an explosive device, and therefore a search of the phone was reasonably related to the objectives of the investigation of the bomb threat.[10]   A wallet, while not an explosive device or seemingly capable of detonating such a device, could contain written notes or materials that would relate to any plan to cause mayhem at the school.   As to intrusiveness, the search of both the phone and wallet was minimally invasive.  The items were in N.U.'s backpack and were not physically removed from N.U.'s person by Stanton.  While N.U. testified that Stanton looked through the phone and

[10] The parties dispute whether N.U. consented to a search of his phone.  The Court need not address this dispute in light of the ruling that any search of the phone did not violate N.U.'s rights

wallet, there is no evidence that he perused either in any detail, took any notes or photographs, or even removed any items from the wallet for inspection.  The lack of any testimony regarding any in-depth search is consistent with N.U.'s testimony that the entire search took a minute and a half.

Even if an material issue of fact existed as to these claims against Stanton, he is entitled to qualified immunity.  Plaintiffs have failed to identify any decision by the Supreme Court, the Second Circuit Court of Appeals, or the New York Court of Appeals addressing the constitutionality of the search of a student's wallet and phone much less one incident to the investigation of a bomb threat or other threat to the safety of a school.  Defendants have cited several cases for the proposition that it was not clearly established law in 2016 that a search of a student's cell phone would violate the Fourth Amendment.  *See* Def. Mem. at 13-14 (citing *Jackson v. McCurry*, 303 F. Supp. 3d 1367, 1376 (M.D. Ga. 2017), *aff'd,* 762 F. App'x 919 (11th Cir. 2019); *DeCossas v. St. Tammany Par. Sch. Bd.*, No. CV 16-3786, 2017 WL 3971248, at *19 (E.D. La. Sept. 8, 2017); *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 625-26 (N.D. Tex. 2017)).

The only cases cited by Plaintiffs pertain to whether a defendant may claim qualified immunity on summary judgment when there is evidence of that defendant's improper motive. *See* Pl. Opp. at 18.  Those cases stand for the proposition that where retaliatory intent is an element of plaintiff's claim, evidence of defendant's retaliatory animus is sufficient to foreclose qualified immunity defense on summary judgment  *See Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 385 (2d Cir. 2003); *see also Abel v. Morabito,* No., 2009 WL 321007, at *7 (S.D.N.Y. 2009) (defendants allegedly commenced suit for back taxes in retaliation for plaintiff having written negative columns in the local paper). To defeat a defendant's claim of qualified

immunity in such a case, plaintiff must show "particularized evidence of direct or circumstantial facts supporting the claim of an improper motive in order to avoid summary judgment." *Sheppard v. Beerman,* 94 F.3d 823, 828 (2d Cir. 1996).  .  The cases cited by Plaintiffs are inapplicable in light of the nature of their claims and given that Plaintiffs have not identified an improper motive let alone provided evidence showing that one existed.

As there was no clearly established right to be free of the searches, it was objectively reasonable for Stanton to believe that a search of all of N.U.'s belongings was reasonable in light of N.U.'s admitted threat to blow up school property.  His entitled to qualified immunity and the Fourth Amendment claim against him is dismissed.

**B.  Section 1983 – Fourteenth Amendment Substantive Due Process**

The Fourteenth Amendment "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable."  *Pena v. DePrisco,* 432 F.3d 98, 112 (2d Cir. 2005).  To establish a substantive due process claim, "a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Pena,* 432 F.3d at 112 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

Plaintiffs claim that N.U.'s substantive due process rights were violated because Defendants (1) "subjected him to an unreasonably intimidating and coercive interrogation and search," and (2) forced him "to make a written confession that was used as a means to suspend him from school." Pl. Opp. at 19.  The undisputed facts simply do not support these arguments. The time over which the interview and search took place was not unduly long and there is neither allegation nor evidence of physical contact, or the threat of physical contact, by either adult.

20

Beyond the intimidation inherent in being called to the principal's office, Plaintiffs claim only that Stanton "yelled" or "screamed" at N.U. while either in front of the principal or in a room with the door open.

Even if Stanton's conduct was unjustified, "not all wrongs perpetrated by a government actor violate due process." *Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (where seventh grade student claimed teacher slapped him across the face, the wrong "though regrettable, simply is not of constitutional proportions"). Plaintiffs have not cited to any case finding that yelling or screaming alone constitutes a violation of a student's substantive due process rights. To the contrary, courts have routinely dismissed more egregious cases where the verbal misconduct visited upon the plaintiff was accompanied by the use of physical force. *See, e.g., Votta ex rel. R.V. & J.V. v. Castellani*, 600 F. App'x 16, 19 (2d Cir. 2015) (summary order) (coach's conduct including "handling the players roughly, grabbing their facemasks and shoulder pads, shaking them, and screaming at them in such close proximity that he spat on them" constituted "minor infringement" which "even considered in the aggregate" was insufficient to support a jury determination that the conduct shocked the conscience); *B.A. on behalf of M.G., Jr. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 524 (N.D.N.Y. 2016) (no violation where 1st grade teacher, upon finding a six-year old student using a phone without permission, "grabbed him by both arms, shook him by the shoulders, slammed him into a chair, and yelled in his face that he should 'stop crying' between thirteen and twenty times"); *Perrin v. Canandaigua City Sch. Dist.*, No. 08-CV-6153L, 2008 WL 5054241, at *1 (W.D.N.Y. Nov. 21, 2008) (no violation where wrestling coach pulled student's arms "behind his back, force[d] him through the door to the locker room and started to punch and poke him in the chest while berating him with the use of foul, profane and demeaning language"). Under the

circumstances, the mere facts that Stanton may have raised his voice and looked angry do not, as a matter of law, shock the conscience.

There is also no viable substantive due process claim related to the preparation of N.U.'s written statement which Plaintiffs claim was coerced by Stanton.  To prevail on such a claim, a plaintiff must show "more than official misconduct, or even coercion," *Mara*, 921 F.3d at 78, but rather that the conduct was so egregious or outrageous so as to shock the contemporary conscience.  The conduct must be assessed by looking at the circumstances and the participants, which in this case involves a middle school student and school administrator.  Taking N.U.'s testimony as true, Stanton yelled at him, told him to write falsehoods in his written statement, and ripped up the first statement and forced him to write a second statement.  While such conduct could clearly be unpleasant, especially to a middle school student, it is simply insufficient to rise to the level of a constitutional violation.   To the extent Plaintiffs claim that Stanton attempted to coerce N.U. to write a false statement, any such efforts were unsuccessful as N.U. testified that he did not follow those instructions and that his statement was true and accurate regarding what he had said in the cafeteria.   As such, N.U. was not so discomfited by Stanton's conduct that he felt compelled to accede to the purported demands.

Finally, there is no evidence whatsoever of bad faith or impermissible motive on the part of either Bernard or Stanton, or that they held any animus towards N.U.  To the extent any of Defendants' questions, such as whether N.U. said he was part of ISIS or whether he used a foreign language in the cafeteria, could be construed to be discriminatory in any way, Defendants were following-up on statements made by the students who witnessed N.U.'s conduct.

Any liability as to the imposition of the five-day suspension lies with Bernard alone, as Stanton had no authority to take such action.  A student's substantive due process rights are

violated "upon a showing that an administrator's decision to expel the student was arbitrary or irrational or motivated by bad faith." *DeFabio v. E. Hampton Union Free Sch. Dist.,* 623 F.3d 71, 82 (2d Cir. 2010) (internal quotation marks and citation omitted).  It is not, however, "the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland,* 420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975), *abrogated on other grds by Harlow,* 457 U.S. 800.  Plaintiffs have provided neither argument nor case support for a finding that Bernard's action was irrational.  N.U. admitted that he had made the statement that he was a terrorist and that he intended to blow up school property.  Regardless of whether that threat was genuine, it cannot be said that Bernard's reliance on that admission and his decision to suspend N.U. lacked rationality.  To the extent N.U. ended up being out of school for several weeks beyond the initial five days, no claim lies against Defendants.  Bernard was authorized only to suspend him for five days and there is no evidence that he had personal involvement with the extended length of time N.U. was out.  Moreover, N.U.'s parents requested multiple adjournments of the Superintendent's Hearing which contributed in great part to the delay.

Even if there was an issue of material fact regarding the claim against Bernard regarding N.U.'s suspension, he is entitled to qualified immunity for that act.  Bernard's use of his authority to suspend N.U. for the full five-day period authorized by law was objectively reasonable.  The Court is unaware of any precedent or rationale that would compel it to substitute its judgment for that of a building principal imposing discipline on a student who admittedly threatened to blow up school property.

**C.  State Law Claim – IIED**

Under New York law, "a claim for IIED requires a showing of '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'"  *Rich v. Fox News Network, LLC,* 939 F.3d 112, 122 (2d Cir. 2019) (quoting *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993)). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress."  *Restis v. Am. Coal. Against Nuclear Iran, Inc.,* 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014) (citing *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir. 1996)).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Brown v. Sears Roebuck & Co.,* 297 A.D.2d 205, 212, 746 N.Y.S.2d 141 (1st Dep't 2002) (quoting *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983) (internal quotation marks and citation omitted)).

Plaintiffs summarily argue that Defendants' actions "certainly rise to the level of extreme and outrageous conduct with caused N.U. severe emotional distress."  Pls. Opp. at 22.  In the lone case cited by Plaintiffs, *Caviness v. Durham Public Sch. Bd. of Ed.,* No. 95CV00878, 1996 WL 33657236 (M.D. N. Car. 1996), the court decided that the *allegation* that the nine- and ten-year old elementary school students detained for six hours were subjected to a "terrifying and harassing detention, search and interrogation" was sufficient to defeat a motion to dismiss an IIED claim.  Plaintiffs here were similarly successful in defeating the motion to dismiss the IIED claim.  At the summary judgment stage, however, Plaintiffs must rely on evidence, which they have failed to do.  There is no evidence of any conduct by Bernard that establishes an IIED claim

against him.  As to Stanton's conduct, no reasonable jury could find that his actions were so extreme or outrageous to go beyond the bounds of decency.  As no reasonable jury could find for Plaintiffs on their IIED claim, Defendants' motion for summary judgment is granted.

## D.  Derivative Claims

Defendants contend that as Amar does not have any direct claim against Defendants, and that she has no cognizable claim derived from the deprivation of N.U.'s constitutional rights, the complaint should be dismissed as to her claims.  Plaintiffs do not address Defendants' arguments regarding Amar's claims in their opposition to the motion.

In this Circuit, "in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to a summary judgment motion] that relevant claims or defenses that are not defended have been abandoned."  *Jackson v. Fed. Express,* 766 F.3d 189, 198 (2d Cir. 2014); *accord Grassel v. Dep't of Educ. of City of N.Y.,* No. 12 CV 1016, 2015 WL 5657343, at *9 (E.D.N.Y. Sept. 24, 2015) ("When a party opposing summary judgment fails to respond to the moving party's argument on a claim, the Court may deem the claim abandoned").  Although Defendants expressly moved for summary judgment on Amar's derivative claims, Plaintiffs did not even reference those claims let alone address any of Defendant's arguments.  Accordingly, Amar's claims are deemed abandoned, and summary judgment is granted in favor of Defendants.

**IV.  CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment, DE [65], is granted.  The Clerk of the Court is directed to enter judgment for Defendants and to close the case.

**SO ORDERED**.

/s/ *Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated: Central Islip, New York
        November 30, 2020